UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

THE MICCOSUKEE TRIBE
OF INDIANS OF FLORIDA,

     Plaintiff,

v.

UNITED STATES DEPARTMENT OF THE
TREASURY and UNITED STATES OF
AMERICA,

     Defendants.

Case No. 1:20-cv-23182-KMW

## PLAINTIFF'S EXPEDITED MOTION FOR PRELIMINARY INJUNCTION

## AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, the Miccosukee Tribe of Indians of Florida ("Miccosukee Tribe" or "Tribe"), pursuant to Federal Rule of Civil Procedure 65(a), moves the Court for a preliminary injunction preventing Defendant, the United States Department of the Treasury ("Treasury"), from disbursing $2 million of the remaining "hundreds of millions" of CARES Act funds specifically designated for Tribal governments.  Congress appropriated the funds at issue to ameliorate the harms Native American tribes have suffered due to the COVID-19 pandemic, and tasked Treasury with distributing such funds "based on increased expenditures" of tribal government.  In distributing CARES Act funds, however, Treasury arbitrarily and capriciously determined that the Miccosukee Tribe had *zero members*, resulting in a drastically reduced distribution to the Tribe.

If the remaining CARES Act funds are disbursed before this Court rules on the merits of this case, the Miccosukee Tribe will be irreparably harmed because it will be effectively barred from obtaining a full and fair remedy for its claims, even if the Court ultimately rules for the Tribe on the merits.  Because the Tribe is likely to succeed on the merits, and meets the other

requirements for a preliminary injunction, the Court should prohibit Treasury from disbursing $2 million of the remaining CARES Act funds, pending further proceedings in this case.

**<u>NEED FOR EXPEDITED CONSIDERATION BY OCTOBER 9, 2020</u>**

The remaining "hundreds of millions" of CARES Act funds are the only funds available to satisfy the judgment that the Tribe seeks in this case.  The matter is urgent, because the remaining funds could be disbursed to other tribal governments or tribal entities—other than the Miccosukee Tribe—at any point following the resolution of an expedited appeal pending before the U.S. Court of Appeals for the D.C. Circuit.  *See Confederated Tribes of the Chehalis Reservation, et al., v. Mnuchin*, Case # 20-5204 (D.C. Cir.).

Treasury determined that approximately 130 Alaskan Native Corporations and Villages ("ANCs") were eligible to receive CARES Act funds specifically designated for Tribal governments.  Several Native American Tribes challenged Treasury's determination.  Whether ANCs are eligible for CARES Act funds remains in dispute and is currently under expedited consideration by the U.S. Court of Appeals for the D.C. Circuit.  *See Confederated Tribes of the Chehalis Reservation, et al., v. Mnuchin, et al.*, Case No. 20-5204 (D.C. Cir.).  On September 11, 2020, the D.C. Circuit Court heard oral arguments in the *Confederated Tribes* matter.  On September 14, 2020, the D.C. Circuit issued an order enjoining Treasury from disbursing the remaining CARES Act funds pending resolution of the appeal.  *See Confederated Tribes,* Case No. 20-5204 (D.C. Cir.), Document #1861346 (order enjoining disbursement) (copy included as <u>Exhibit 1</u>).  The D.C. Circuit could issue a ruling and revoke its order enjoining Treasury at any time.

The Miccosukee Tribe cannot determine when the D.C. Circuit will issue an opinion in the expedited *Confederated Tribes* matter.  The Tribe also cannot determine how long the D.C.

2

Circuit's order enjoining Treasury will remain in effect.  Thus, the Tribe cannot specify a specific date by which it needs a ruling on its preliminary injunction request.  The Tribe, however, reasonably believes that this Court will need to rule on this motion within the next 21 days (on or before October 9, 2020) in order to prevent Treasury from disbursing funds necessary to resolve this matter.  The Miccosukee Tribe intends to monitor the expedited appeal of the *Confederated Tribes* matter and will promptly notify the Court of any change in status that might necessitate a ruling on the Tribe's Motion before October 9, 2020.

## OVERVIEW

This case arises under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, 134 Stat. 281 (2020), which Congress enacted to provide economic relief for American workers, families, small businesses, and Tribal, state, and local governments harmed by the COVID-19 pandemic.  The parties' dispute concerns the portion of CARES Act funds that Congress earmarked for Tribal governments.  Title V of the CARES Act directs Treasury to allocate $8 billion among the Tribal governments based on their increased expenditures arising from the pandemic, relative to expenditures during 2019.  Treasury decided to use each Tribe's population as a proxy for the increased relative expenditures that the statute specifies as the yardstick for the amount each Tribe is entitled to receive.

Treasury acted arbitrarily and capriciously when it decided the amount allocated to the Miccosukee Tribe through this population-based decision-making process.  Treasury determined that the Miccosukee Tribe had a population of zero, even though the agency knew that the Tribe's population was approximately 600.  Treasury reached this incoherent conclusion without addressing how a Tribe could even exist, much less form a government or be entitled to a distribution, if it had no members at all.  Treasury's "zero-population" determination resulted in a

$100,000 distribution to the Tribe (the amount sent to any Tribe with a population of less than 37), instead of approximately $2 million (the amount the Tribe reasonably believes it should have received had Treasury based its distribution on the Tribe's actual population).

Due to the impending distribution of all remaining CARES Act Funds, the Miccosukee Tribe faces irreparable harm. Once the remaining funds are distributed the Tribe will no longer have an opportunity for a full and fair remedy in this case. To protect its ability to obtain such a remedy, the Tribe now moves for entry of a preliminary injunction preventing Treasury from distributing $2 million. That amount is a small fraction—likely 1% or less—of the "hundreds of millions" of CARES Act Funds remaining to be distributed by Treasury. But that amount is substantial for the Tribe, which faces continuing obligations to combat the pandemic. To prevent the Tribe from irretrievably losing these funds, the Court should issue a preliminary injunction in order to "protect the movant from irreparable injury and preserve the status quo" pending further proceedings. *Talib v. Skyway Commc'ns Holding Corp.*, No. 8:05-cv-282-T-17TBM, 2005 U.S. Dist. LEXIS 61561, at *15 (M.D. Fla. Apr. 5, 2005) (citing *United States v. DBB, Inc.*, 180 F.3d 1277 (11th Cir. 1999)).

## STATEMENT OF THE CASE

### A.    Applicable Statute

On March 27, 2020, Congress enacted the CARES Act to provide economic relief for Tribal, state, and local governments in connection with the COVID-19 pandemic. Congress set aside $8 billion in direct aid for "Tribal governments" in Title V of the Act. 42 U.S.C. § 801(a)(2)(B).

In Title V, Congress directed Treasury to distribute relief funds "based on increased expenditures" in fiscal year 2020 relative to expenditures in fiscal year 2019.  Specifically, Title V states:

> From the amount set aside under subsection (a)(2)(B) for fiscal year 2020, ***the amount paid*** under this section for fiscal year 2020 to a Tribal government ***shall be the amount the Secretary shall determine, in consultation with the Secretary of the Interior and Indian Tribes, that is based on increased expenditures of each such Tribal government ... relative to aggregate expenditures in fiscal year 2019 by the Tribal government*** ... and determined in such manner as the Secretary determines appropriate to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments.

*Id.* § 801(c)(7) (emphasis added).  The CARES Act restricted Treasury's discretion in effectuating the Title V fund distributions by, among other restrictions, mandating that distributions must be "based on" such "increased [relative] expenditures" of Tribal governments (as defined in the statute).  *Id.* §§ 801(c)(7), (g)(5).

### B.   Treasury's Determination of the Miccosukee Tribe's Distribution Based Upon a Claimed Population of Zero

The Miccosukee Tribe is a federally recognized Tribal government.  It therefore is indisputably entitled to receive Title V funds based on its increased expenditures in fiscal year 2020 relative to fiscal year 2019.

On April 13, 2020, Treasury published a form on its website designed to collect evidence pertinent to its decisions regarding distribution of the Title V funds.  The form—entitled "Certification for Requested Tribal Data"—sought enrollment data from all 574 federally-recognized Tribal governments.  On April 17, 2020, the Miccosukee Tribe submitted the requested data to Treasury, certifying its enrollment of 605 members.  *See* <u>Exhibit 2</u>.  Treasury never questioned the Miccosukee Tribe's enrollment data.

Three weeks later, on May 5, 2020, Secretary Mnuchin and Department of the Interior Secretary David Bernhardt issued a joint press release announcing their agreed-upon plan for allocating the Title V funds. *See* Exhibit 3.[1]  According to the plan, Treasury would split the Title V funds into two allocations.  The first sixty percent of the Title V funds ($4.8 billion) would be distributed based on tribal population ("Population Distribution").  That is the distribution at issue in this case.  Addressing this Population Distribution, the joint press announcement stated that "Tribal population [was] expected to correlate reasonably well with the amount of increased expenditures of Tribal governments related directly to the public health emergency, such as increased costs to address medical and public health needs."  Exhibit 3, p. 2.

Under the plan, Population Distributions were based "on Tribal population data used by the Department of Housing and Urban Development (HUD) in connection with the Indian Housing Block Grant (IHBG) program" ("IHBG Data").  *See* Exhibit 4, p. 2 (*U.S Dep't of the Treasury, Coronavirus Relief Fund, Allocations to Tribal Governments* (May 5, 2020)).[2]  Treasury did not provide any prior notice of this decision.  According to Treasury, it used IHBG Data to determine Population Distributions because it believed such data was a "reliable and consistently-prepared" metric.  *See* Exhibit 4, p. 2.  The IHBG Data, however, provides inconsistent population counts for the Tribes.  *See* Exhibit 5.[3]  The Data includes three types of statistics that ostensibly measure a Tribe's population: (1) Census data for  "American Indian/Alaskan Natives" ("AIAN Population

---

[1]  Also available at:  https://home.treasury.gov/news/press-releases/sm998 (last visited September 17, 2020).

[2]  Also available at: https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf (last visited September 14, 2020).

[3] Also available at: https://www.hud.gov/sites/dfiles/PIH/documents/FY%202020%20Final%20Summary%20-%20Needs%20and%20Allocation.pdf (last visited September 14, 2020).

Count"), (2) "Enrollment" data, and (3) "Total Service Area Indian Population ("TSAIP") data. *See* Exhibit 5; *see also,* Exhibit 4, pp. 2–3 & fn. 10. Each category listed a different population count for the Miccosukee Tribe: (1) an AIAN Population count of zero, (2) an Enrollment count of 400, and (3) a TSAIP count of 589. *Id.* Treasury selected the AIAN Population Count—of zero—as the figure to use. In so doing, Treasury ignored (a) the other two categories of IHBG data; (b) data provided directly by the Miccosukee Tribe in its "Certification for Requested Tribal Data"; (c) tribal population data maintained by the U.S. Department of the Interior; and, (d) tribal population information maintained by Treasury.

On the same day that they announced their population-based formula for allocating Title V funds, the Treasury Secretary and the Interior Secretary announced the amounts of the first distribution to Tribal governments. Based on Treasury's determination that the Miccosukee Tribe had zero members, the Tribe received a Population Distribution of only $100,000, which was the distribution amount Treasury assigned to "the smallest Indian Tribes . . . with a population of less than 37." *See* Exhibit 4, p. 2.

**C.     The Miccosukee Tribe's Effort to Correct Treasury's Population Error**

Upon learning that Treasury based the Tribe's Population Distribution on a demonstrably incorrect AIAN Population Count, the Miccosukee Tribe sought to correct Treasury's mistake through consultation with U.S. government representatives. On May 19, 2020, the Tribe sent a letter to President Donald Trump and Secretary Mnuchin requesting that they correct the mistake. *See* Exhibit 6. On May 28, 2020, several Members of the U.S. Congress also sent a letter to Secretary Mnuchin requesting that he correct the mistake. *See* Exhibit 7. The Miccosukee Tribe also contacted White House staff, Treasury staff, Interior staff, and the staff of Florida's U.S.

Senators Rick Scott and Marco Rubio.  U.S. government representatives indicated that Treasury realized its mistake and was working on a potential solution.

That solution never came.  On June 17, 2020 Treasury announced its distribution of the remaining 40-percent ($3.2 billion) of Title V funds without correcting the original flawed Population Distributions.  *See* Exhibit 8 (*Coronavirus Relief Fund Allocations to Tribal Governments Updated* (June 17, 2020)).[4]

### D.    The Impending Disbursement of the Remaining CARES Act Funds.

Treasury determined that "hundreds of millions" of CARES Act funds should be distributed to approximately 130 Alaskan Native Corporations ("ANCs").  Several Native American Tribes challenged the eligibility of ANCs to receive CARES Act funds designated for Tribal governments.  *See Confederated Tribes of the Chehalis Reservation, et al., v. Mnuchin*, Case No. 20-cv-01002 (APM) (D.D.C. Apr. 27, 2020).  The U.S. District Court for the District of Columbia enjoined Treasury from distributing CARES Act funds to ANCs after determining that the Native American Tribes had a reasonable likelihood of success on the merits.  *See id*., Dkt. No. 36, Memorandum Opinion, 2020 U.S. Dist. LEXIS 73355 (D.D.C. Apr. 27, 2020).  The District Court, however, ultimately held that ANCs are eligible to receive CARES Act funds.  *See id.* Dkt. No. 97, Opinion, 2020 U.S. Dist. LEXIS 112926 (D.D.C. June 26, 2020)).  The District Court then granted an injunction pending the appeal of its decision that ANCs are eligible to receive CARES Act funds.  *See id.,* Dkt. No.  107, Opinion 2020 U.S. Dist. LEXIS 118734 (D.D.C. July 7, 2020).

Whether ANCs are eligible for CARES Act funds remains in dispute and is under expedited consideration by the U.S. Court of Appeals for the D.C. Circuit.  *See Confederated Tribes of the*

---

[4] Also available at: https://home.treasury.gov/system/files/136/Tribal-Allocation-Methodology-for-Second-Distribution.pdf (last visited September 14, 2020).

*Chehalis Reservation, et al., v. Mnuchin, et al.*, Case No. 20-5204 (D.C. Cir.).  On September 11, 2020, the D.C. Circuit Court heard oral arguments in the *Confederated Tribes* matter.  On September 14, 2020, the D.C. Circuit issued an order enjoining Treasury from disbursing the remaining CARES Act funds pending resolution of the appeal.  The D.C. Circuit could issue a ruling and revoke its order enjoining Treasury at any time.

## ARGUMENT

To secure a preliminary injunction, a plaintiff must establish: (1) a substantial likelihood of success on the merits of the underlying case; (2) that it would suffer irreparable harm without an injunction; (3) that the harm plaintiff would suffer outweighs the harm the opposing party would suffer; and (4) that the injunction would not disserve the public interest.  *See Hoop Culture, Inc. v. Gap Inc.*, 648 F. App'x 981, 983 (11th Cir. 2016) (*citing Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000).  This Court should issue the requested preliminary injunction because the Miccosukee Tribe satisfies all four criteria.

### A.  The Tribe is Likely to Succeed on the Merits of Its Claim That Treasury's Distribution Decision Was Arbitrary and Capricious.

The Administrative Procedure Act ("APA") empowers this Court to set aside arbitrary and capricious agency actions.  5 U.S.C. § 706(2)(A).  The actions subject to this remedy include agency determinations regarding grants of money, such as the one at issue here.  5 U.S.C. §§ 551(10)(B), (11)(A), (13).  In considering whether agency actions are arbitrary and capricious, the Court's role is to "ensur[e] that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).  In particular, the Court must review "whether the agency examined the ***relevant data and articulated a satisfactory explanation*** for its action, including a rational connection between the facts found and the choice made, and whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Mozilla Corp. v. FCC*,

9

940 F.3d 1, 49 (D.C. Cir. 2019) (internal quotations omitted and emphasis added). "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999) (citation and quotation omitted).

The Tribe is likely to prove that Treasury's "zero-population" funding determination is arbitrary and capricious for at least five reasons. *First*, Treasury knew at the time that it made the determination that the population listing of zero was not correct, and knew that the Tribe had hundreds of members, documented in a variety of different sources of evidence before the agency. "Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decision-making." *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003).

*Second*, it was irrational for Treasury to conclude that a Tribe could have zero members yet still be a Tribe—and one entitled to a distribution of federal funds at that. If a Tribe had zero members how could it even exist to receive the distribution? The profound internal inconsistency in Treasury's determination rendered it arbitrary and capricious. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (agency's "reasoning cannot be internally inconsistent" or its decision is arbitrary and capricious) (citing *Sierra Club v. EPA*, 884 F.3d 1185, 1194–96 (D.C. Cir. 2018)).

*Third*, the agency utterly failed to explore or resolve the conflicts among the various sources of population data (all of which Treasury plainly had before it during the decision-making process): the Tribe's April 2020 Certification of 605 (which Treasury itself solicited) and the three internally-inconsistent population figures in the IHBG report (only one of which Treasury decided to rely upon). "If an agency fails to examine the relevant data—which examination could reveal,

*inter alia*, that the figures being used are erroneous—it has failed to comply with the APA." *Dist.*
*Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir 2015).  Rather than exploring and
resolving the conflicts in the population figures, Treasury simply ignored population data other
than the AIAN figure the agency wanted to rely upon. It was "arbitrary and capricious for [the
agency] to rely on portions of studies in the record that support its position, while ignoring cross
sections in those studies that do not." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir.
2018); *see also Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("an agency cannot ignore
evidence contradicting its position").

Fourth, because Treasury failed to explore conflicts between the different population
figures presented to it, the agency could not—and did not—give a rational explanation for how it
chose a population number of zero in the face of conflicting evidence.  The lack of a rational
explanation for Treasury's determination rendered it arbitrary and capricious.  *See, e.g.*, *Tourus*
*Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (an agency must "explain 'why it chose
to do what it did' and an agency's failure to "set forth its reasons for decision" constitutes arbitrary
and capricious agency action); *NorthWestern Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir.
2018) (agency decision is arbitrary and capricious if it is not "reasonable and reasonably
explained"); *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (agencies are required
to "adequately explain [their] result[s]"); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C.
Cir. 2014) ("conclusory statements will not do; an 'agency's statement must be one of reasoning'")
(citation omitted).

*Finally*, the agency relied upon a generic assumption that the AIAN figure of zero was a
"reliable and consistently-prepared" metric (Exhibit 4, p. 2), in the face of concrete evidence that
it was not.  An agency's "reliance on a report or study without ascertaining the accuracy of the

11

data contained in the study or the methodology used to collect the data is arbitrary." *New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992).

### B.    The Tribe Faces Imminent Irreparable Harm.

The Miccosukee Tribe faces imminent irreparable harm unless the Court grants this motion for a preliminary injunction. Without that order, the Tribe will almost certainly be forced to forfeit its due share of vital Title V funds, without any recourse. The Tribe cannot wait to recover its allocated aid until the end of this litigation, because by that time the remainder of the Title V funds already will likely be distributed. And once appropriated funds have been disbursed, federal courts cannot order Congress to expend additional funds. The Tribe will be irreparably harmed if it cannot recover the funds to which it is entitled.

To establish irreparable harm, "[t]he injury must be 'neither remote nor speculative, but actual and imminent'" and "cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). In the Eleventh Circuit, "[w]hile economic harm will not satisfy the irreparable-harm element in many cases, that general rule does not necessarily hold where there is no adequate remedy at law to recover damages for the harm suffered." *Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1165 (11th Cir. 2018) (citing *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

Irreparable harm (from an inadequate remedy) occurs when a plaintiff seeks recovery from a congressionally appropriated fund that a federal agency already has distributed to other parties. "Funds appropriated for an agency's use can become unavailable in three circumstances: if the appropriation lapses; if the funds have already been awarded to other recipients; or if Congress rescinds the appropriation." *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F. 3d 1421, 1426 (D.C. Cir. 1994). Where, as here, funds already have been awarded to other recipients, later

claimants for the same funds are irreparably harmed.  *See Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) ("Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."); *see also City of Houston*, 24 F. 3d at 1426 (holding that Houston's challenge to its block grant aid was moot because "the panel can offer no relief which 'can redress [appellant's] asserted grievance'—namely, the denial of over $2.6 million in CDBG funds.").  Indeed, it is a well-settled matter of constitutional law that federal courts cannot order the "obligation of funds for which there is no appropriation."  *Id.*

The Miccosukee Tribe will be irreparably harmed if Treasury distributes the remaining Title V funds to other Tribes before this Court enters final judgment in this case, because at that point the Tribe will have no ability to recover the disputed funds.  If the Tribe is successful on the merits of this litigation, it will be entitled to approximately $2 million in additional COVID-19 relief funds for its 605 members.  Those dollars must be paid out of the Title V funds.  42 U.S.C. § 801(a)(2)(B). Hundreds of millions of Title V dollars have not yet been distributed,[5] but there is an imminent and substantial threat that they soon may be.  As discussed previously, in the *Confederated Tribes* matter, the D.C. Circuit Court of Appeals is currently considering, on an expedited basis, whether Treasury can distribute CARES Act funds to Alaskan Native Corporations.  *See discussion, infra,* pp. 7–8.  The D.C. Circuit held oral argument in the case on September 11, 2020 and is now poised to rule at any time (and likely promptly, given consideration of the appeal on an expedited basis). In addition, the D.C. Circuit has discretion to issue its mandate immediately.  *See* D.C. Cir. Local Rule 41(a)(1).  Accordingly, if the Circuit affirms, the distribution of the funds could occur

---

[5] *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, No. 20-5205 (D.C. Cir.); Appellant's Brief at 21–22.

imminently and with minimal (if any) prior notice.  At that point the Miccosukee Tribe would be left without a full and adequate remedy.

### C.     The Remaining Factors Justify Issuing a Preliminary Injunction.

#### 1.   The Harm to the Tribe Outweighs any Harm to Treasury.

The balance of the equities also weighs heavily in the Tribe's favor.  The Miccosukee Tribe will face substantial harm in losing vital relief funds as it continues to face obligations related to the pandemic.  In stark contrast, Treasury will suffer no harm if it is enjoined from distributing approximately $2 million of the remaining "hundreds of millions" of Title V funds.  Indeed, Treasury itself previously sought to withhold $678 million of Title V funds from distribution in order to resolve lawsuits arising from the distributions it made to Tribal governments based on false population data.  *See* Exhibit 9, p. 2 (*Coronavirus Relief Fund Allocations to Tribal Governments Updated* (June 12, 2020)).[6]  Treasury would not voluntarily cause itself harm.

The Miccosukee Tribe merely asks the Court to preserve the status quo. In such cases, the balance tips in favor of the plaintiff.  *See, e.g., Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129-30 (D.D.C. 2012) (balance of equities tipped in favor of plaintiffs because otherwise there "would result in a change in the status quo"); *see also Sherley v. Sebelius*, 644 F.3d 388, 398 (D.D.C. 2011) (denying a preliminary injunction where it would upend the status quo); *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245-46 (D.D.C. 2014) (granting a preliminary injunction where doing so "preserve[d] the relative positions of the parties" and preserved the status quo (*quoting Rufer v. FEC*, 64 F. Supp. 3d 195, 206 (D.D.C. 2014)).

---

[6] Also available at: https://www.indianz.com/covid19/wp-content/uploads/2020/06/treasury061220.pdf (last visited September 17, 2020).  This document was previously available on the Treasury website but appears to have been removed.

### 2.   Issuing the Order Serves the Public Interest.

A preliminary injunction would also serve the public interest.  It is well established that "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate" (here the distribution of funds based upon a rational, evidence-based decision regarding Title V funds).  *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977); *see also Bracco Diagnostics v. Shalala*, 963 F. Supp. 20, 30 (D.D.C. 1997) (there is "a strong public interest in requiring an agency to act lawfully, consistent with its obligations under the APA . . .").

Furthermore, the Miccosukee Tribe does not seek to withhold funds properly distributed to other Tribes.  Rather, it seeks to enjoin Treasury from disbursing only those Title V funds that the Miccosukee Tribe would have otherwise received—and to which it is entitled—had accurate and reliable population data been used in the first place.  That amounts to a relatively small percentage of the remaining Title V funds—approximately $2 million out of the remaining "hundreds of millions."  ANCs waiting on distributions will suffer minimal harm if their distributions are temporarily reduced by a modest percentage: $2 million spread out across over one-hundred Alaskan Native Corporations.  The Miccosukee Tribe, on the other hand, would be forced to bear the full weight of the $2 million loss in aid when its members need it most.  Considering these factors, the public interest favors issuing the preliminary injunction.

### D.   A Recent D.C. District Court Decision Does Not Justify a Different Result.

In seeking this Court's urgent intervention, we are mindful that U.S. District Court for the District of Columbia recently ruled that it was powerless to remedy a CARES Act funding determination by Treasury—no matter how arbitrary and capricious it may have been.  The D.C. District Court issued that ruling in a similar case involving a different tribe.  *See The Shawnee Tribe v. Mnuchin*, No. 20-cv-2020, Dkt. No. 48, Memorandum Opinion (D.D.C. Sept. 10, 2020).

We respectfully submit that this Court should not follow that non-binding out-of-Circuit decision by another District Court, because it was wrongly decided. *See Fishman & Tobin, Inc. v. Tropical Shipping & Constr. Co.,* 240 F.3d 956, 965 (11th Cir. 2001) (one District Court judge's decision is not binding on another District Court judge).

It is well established that "Congress rarely intends to prevent courts from enforcing its directives to federal agencies" and that there is "a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC,* 575 U.S. 480, 486 (2015) (citation omitted). The Court has authority to review Treasury's funding determination here.

In *Shawnee,* the D.C. District Court cited case law, primarily *Lincoln v. Vigil*, 508 U.S. 182, 183 (1993), which created an exception to the presumption of judicial review where the applicable statute does not provide a yardstick for a court to use to evaluate an agency's decisions. Absent a statutory standard, distributions of so-called "lump-sum" appropriations are unreviewable. Case law cited in *Shawnee*, however, does not define "lump-sum" appropriations, and does not hold that courts *never* have authority to review agency decisions regarding allocations from such appropriations. To the contrary, numerous courts have held that they do have authority to review allocation decisions from lump-sum appropriations based upon the specific statutes before them. *See, e.g*., *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 748 (D.C. Cir. 2002) (authorizing judicial review of agency decisions regarding federal subsidies under 2000 Appropriations Act where the statute required distributions to be based on "economic losses incurred during 1999"); *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (authorizing judicial review of agency grant decisions under Community Services Block Grant Act).

At a bare minimum, this oversight necessarily includes assuring that the process for determining the allocation of Title V funds satisfies basic APA standards for rational, evidence-

based decision-making.  Treasury could not seriously argue that this Court would be powerless to intervene if the agency relied on no evidence at all, or fraudulent evidence, or the flip of a coin, to allocate these essential funds to Tribal governments.

Furthermore, unlike some so-called lump-sum appropriations, the CARES Act cannot be considered a standardless delegation of authority to Treasury.  The statutory language of the CARES Act provides a meaningful standard for this Court's judicial review.  Congress mandated that funding received by a Tribal government "shall" be determined by Treasury "based on increased expenditures" by that government relative to 2019.  42 U.S.C. § 801(b)(7).  The requirement to base distributions on increased relative expenditures is an obvious statutory reference point from which the Court can evaluate Treasury's decisions.  The Tribe does not challenge Treasury's discretion, as a general matter, to use Tribal population as a proxy for these increased relative expenditures, given the likely rough correlation between the size of a Tribe and its expenses.  But that does not mean that Treasury also has discretion: (1) to determine Tribal population through an incoherent decision based on demonstrably false data; (2) to fail to assess and resolve conflicts in the evidence before the agency; and, (3) to predetermine that one population figure was consistent and reliable in the face of compelling evidence that it was not. Where, as here, the tribal population data relied on by Treasury is demonstrably false and the agency's decision-making process is irrational, distributions based on that data and process bear no relationship to the statutory yardstick of increased relative expenditures.  Thus, the Court has authority to police that statutory limitation to ensure that Treasury's population determination is not arbitrary and capricious.[7]

_____

[7] It is also significant that Congress believed it was imposing enforceable statutory constraints on Treasury's discretion:  the CARES Act expressly directs Treasury's Inspector General to "conduct monitoring and oversight of the . . .  disbursement . . .  of funds made

## CONCLUSION

Treasury has never disputed the fact that the Miccosukee Tribe has approximately 600 members.  Yet Treasury calculated the Tribe's award of Title V funds based on ***zero members***, without providing the Tribe with notice and an opportunity to object.  Treasury evidently intends to disburse the remaining funds as soon as possible after the D.C. Circuit issues its decision.  After the remaining Title V funds are distributed, the Miccosukee Tribe will suffer irreparable harm.  Thus, the Miccosukee Tribe respectfully requests an order enjoining Treasury from distributing Title V funds that would otherwise be available to the Miccosukee Tribe, or no less than $2 million, until such time as this matter can be resolved.

## REQUEST FOR HEARING

The Miccosukee Tribe respectfully requests a hearing on this Motion.  The Tribe believes a hearing will assist the Court in evaluating the issues presented and will provide the Court the opportunity to request explanations from the parties regarding their respective positions, as necessary.

## CERTIFICATE OF GOOD FAITH CONFERENCE

**(conferred, in part, but unable to resolve issues presented in the motion)**

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that I have conferred with counsel for the defendant, Mr. Jason Lynch, Trial Attorney, U.S. Department of Justice, in a good faith effort to resolve the issues raised herein but have been unable to do so.

Approximately 130 ANCs may constitute non-parties who may be affected by the relief sought in the Expedited Motion.  It is not practical to confer with each of the 130 ANCs.

---

available under this section." 42 U.S.C. § 801(f)(1) (emphasis added).  If the statute is sufficiently specific for the Inspector General to police Treasury's disbursements, it is also sufficiently specific for this Court to conduct a meaningful review.

However, I have attempted to confer with counsel for two organizations which represent ANCs. Attorneys Paul Clement, Erin Murphy, Ragan Naresh, and Matthew Rowen of the Kirkland & Ellis law firm represent trade associations which represent the interests of ANCs.  Specifically, the Kirkland & Ellis attorneys represent the Alaska Native Village Association, Inc., and the Association of ANCSA Regional Corp. Presidents/CEO's Inc., among others, as Intervenor Defendants/Appellees in the *Confederated Tribes* matter pending before the D.C. Circuit Court of Appeals.  On September 17 and 18, 2020, I emailed the Kirkland & Ellis attorneys advising them that the Miccosukee Tribe intends to file its Expedited Motion and asking whether their clients had any position regarding the motion.  On September 17, 2020, I also spoke by phone with attorney Ragan Naresh of the Kirkland & Ellis law firm and advised/asked the same.  As of the time of the filing of this Motion, I have not received a response from the Kirkland & Ellis attorneys.  I will promptly update the Court if I receive a response.

/s/ George B. Abney
George B. Abney

Dated this 18th day of September, 2020.

/s/ George B. Abney
George B. Abney
Daniel F. Diffley (to seek admission *pro hac vice*)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000 (telephone)
(404) 881-4777 (facsimile)
E-mail:  George.Abney@alston.com

Daniel G. Jarcho (to seek admission *pro hac vice*)
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC 20004-1404
(202) 239-3300 (telephone)
(202) 239-3333 (facsimile)
E-mail:  Daniel.Jarcho@alston.com

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on September 18, 2020, I e-mailed a copy of the foregoing document along with the accompanying exhibits to Mr. Jason Lynch, Trial Attorney, U.S. Department of Justice, at the following email address: <u>Jason.lynch@usdoj.gov</u>.  Mr. Lynch has not yet filed a notice of appearance, but he has advised me that he will be representing the government in this matter.

         /s/ George B. Abney      
         George B. Abney
         ALSTON & BIRD LLP
         One Atlantic Center
         1201 West Peachtree Street
         Atlanta, Georgia 30309-3424
         (404) 881-7000 (telephone)
         (404) 881-4777 (facsimile)
         E-mail:  George.Abney@alston.com

## EXHIBIT LIST

Exhibit 1:     Order Enjoining Disbursement, *Confederated Tribes, et al. v. Mnuchin*,
               Case No. 20-5204 (D.C. Cir.), Document #1861346

Exhibit 2:     Certification of Miccosukee Tribe (April 17, 2020)

Exhibit 3:     Press Release from U.S. Treasury & U.S. Dept of Interior (May 5, 2020)

Exhibit 4:     U.S Treasury, Coronavirus Relief Fund, Allocations to Tribal Governments
               (May 5, 2020)

Exhibit 5:     U.S. Dep't. of Housing and Urban Development,  Indian Housing Block
               Grant data (February 2020)

Exhibit 6:     Letter from Miccosukee Tribe to President Donald Trump and Secretary of
               Treasury Steven Mnuchin (May 19, 2020)

Exhibit 7:     Letter from Member of Congress to Secretary Mnuchin (May 8, 2020)

Exhibit 8:     U.S. Treasury, Coronavirus Relief Fund Allocations to Tribal Governments
               Updated (June 17, 2020)

Exhibit 9:     U.S. Treasury, Coronavirus Relief Fund Allocations to Tribal Governments
               Updated (June 12, 2020)

Exhibit 10:    Affidavit of Jeanine Bennett, General Counsel for the Miccosukee Tribe

Exhibit 11:    Affidavit of George B. Abney, attorney for the Miccosukee Tribe