UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| THE MICCOSUKEE TRIBE<br>OF INDIANS OF FLORIDA,<br><br>       Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE<br>TREASURY and UNITED STATES OF<br>AMERICA,<br><br>       Defendants. | Case No. 1:20-cv-23182-KMW |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFF'S EXPEDITED MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, the Miccosukee Tribe of Indians of Florida ("Miccosukee Tribe" or "Tribe"), hereby replies to Defendants' Response in Opposition (Dkt. # 17) to the Tribe's Expedited Motion for Preliminary Injunction (Dkt. # 5).

**SUMMARY**

Primarily for the following reasons, Defendants' Response is without merit:

A.      Treasury fails to respond to the Tribe's claim that its decision to distribute only $100,000 of CARES Act funds to the Tribe, based on its determination that the Tribe had zero members, was arbitrary and capricious. Instead, Treasury responds to different claims that the Tribe has not asserted. Treasury's failure to address the Tribe's specific challenge to its zero-population funding decision constitutes a tacit admission that the Tribe's claim is likely to succeed on the merits.

B.      Treasury's assertion that its funding decision is not subject to judicial review hinges upon ignoring the CARES Act statutory mandate that Treasury must distribute funds "based on increased [relative] expenditures" of each Tribal government. That mandate, which cannot be

ignored, provides a clear measuring stick by which this Court can evaluate Treasury's funding decision.  Furthermore, the D.C. Circuit Court of Appeals recently rejected one of Treasury's assertions that CARES Act funding decisions are not subject to judicial review.  *See Confederated Tribes of the Chehalis Reservation, et al., v. Mnuchin*, Case # 20-5204 (D.C. Cir.), slip opinion (Sept. 25, 2020) (copy included as Exhibit 1).

       3.     Defendants fail to allege any harm caused by the timing of the Tribe's complaint and expedited motion for preliminary injunction.  And the timing is not suspect because: (1) the Tribe responsibly sought to resolve this dispute by means other than litigation; and, (2) the exigency regarding the remaining CARES Act funds arose only recently, thus necessitating the Tribe's Expedited Motion.

## ARGUMENT AND AUTHORITIES

**A. Defendants Fail to Respond to the Tribe' Claim that its "Zero-Population" Determination was Arbitrary and Capricious.**

In its Expedited Motion the Tribe established that that it is likely to prove that Treasury's specific funding determination for the Tribe was arbitrary and capricious for at least five reasons:

1. Treasury knew at the time that it made the determination that the population listing of zero was not correct;

2. It was irrational for Treasury to conclude that a Tribe could have zero members yet still be a Tribe entitled to a distribution;

3. Treasury failed to explore or resolve the conflicts among the various sources of population data for the Miccosukee Tribe;

4. Treasury did not give a rational explanation for how it chose a population number of zero in the face of conflicting evidence; and

5. Treasury relied on an incorrect assumption that the Tribe's IHBG/AIAN population of zero was a reliable and consistently-prepared metric in the face of concrete evidence that it was not.

Pl. Br. at 10-12.  Treasury does not respond to any of these arguments.

Instead, Treasury attempts to change the subject to a *different* agency decision: the general decision to rely upon the IHBG/AIAN dataset, instead of other datasets, for all Tribal funding determinations. Treasury suggests that the Miccosukee Tribe is challenging the wrong agency decision. Defs' Br. at 17 (accusing the Tribe of "misconstru[ing] the relevant agency decision" and of having a "myopic focus on its own datum"). Treasury does not, however, refute the arbitrary and capricious nature of its specific funding determination for the Miccosukee Tribe.

Treasury cannot rewrite the Tribe's complaint or otherwise dictate the parameters of the Tribe's challenge. The Tribe's motion and complaint both target the particular Miccosukee funding decision at issue here. Pl. Br. at 9 (challenging Treasury's "zero-population" funding determination for the Tribe); Complaint ¶ 57 ("The Treasury Secretary's Population Distribution of $100,000 to the Miccosukee Tribe was a final agency action within the meaning of, and subject to judicial review under, the Administrative Procedure Act, 5 U.S.C. § 706.").

Both the CARES Act and the Administrative Procedure Act (APA) establish that Treasury's specific funding determination for the Miccosukee Tribe is a proper target for judicial review. In the text of the CARES Act, Congress expressly referred to such individualized determinations as decisions that Treasury must make, within specific statutory constraints, for each Tribe: the "amount paid . . . to *a* Tribal government" must be based on increased expenditures of "*each such* Tribal government" relative to 2019 expenditures by "*the* Tribal government." 42 U.S.C. § 801(c)(7) (emphasis added). And the APA defines such individualized funding determinations as agency actions subject to judicial review. The APA expressly authorizes judicial review of five specific categories of "discrete agency actions." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). One of those categories is an agency action "withhold[ing]" a "grant of money." 5 U.S.C. §§ 10(B), 11(A); *see also Norton*, 542 U.S. at 62. The Tribe's

3

expedited motion challenges Treasury's decision to withhold a grant of CARES Act funds due to its irrational decision-making process.[1]

Finally, Treasury argues—unpersuasively—that under the CARES Act it has unfettered discretion to make an across-the-board decision to use IHBG/AIAN data for all Tribal funding determinations regardless of whether specific applications of such data are irrational. *See* Defs' Br. at 18. That broad-brush approach would effectively nullify the specific statutory command that each Tribal government is entitled to a distribution based on its own increased expenditures. *See* 42 U.S.C. § 801(c)(7). Absolute precision may not be required. Contrary to its assertions, however, Treasury still has a fundamental obligation to establish "a rational connection between the facts found and the choice made" in executing the statutory command to decide the amount distributed to each Tribe. *See, e.g.*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 49 (D.C. Cir. 2019). Treasury cannot escape that obligation by asserting that its decision-making would be more efficient if it were free to ignore irrational results arising from the application of IHBG/AIAN data in particular funding decisions. "The APA's presumption of judicial review is a repudiation of the principle that efficiency of regulation conquers all." *Sackett v. EPA*, 566 U.S. 120, 130 (2012).

If Treasury were correct, and it could rely exclusively on the IHBG/AIAN data no matter how irrational an individual funding decision may be, the agency could have (1) refused to distribute *any* funds to Indian Tribes not listed in the IHBG/AIAN data, or (2) distributed funds to

---

[1] Because the Tribe's motion challenges the specific funding determination for the Miccosukee, not the agency's choice of one dataset over another, the Tribe does not claim here that Treasury could never use IHBG/AIAN data in determining distributions to other tribes. Treasury misconstrues the Tribe's argument in suggesting otherwise. *See* Defs' Br. at 18 n.15. The Tribe's argument is that Treasury could not rationally rely on a population figure of zero when the agency had ample evidence that the Miccosukee Tribe has hundreds of members. The remedy flowing from a final judgment on the Tribe's claim would be a remand to the agency to resolve the conflicting Miccosukee population figures through a rational decision-making process, not a judicial directive to use one dataset instead of another.

state-recognized Indian Tribes that receive HUD funds but are not recognized by the Federal government. Doing so would plainly violate the statutory command that each Tribal government is entitled to a distribution based upon its own increase in relative expenditures, and that only Federally recognized tribes are entitled to funding.

At the time it made its population distributions Treasury publicly acknowledged the limitations of the IHBG/AIAN data. Specifically, Treasury announced that some Tribes that were eligible to receive CARES Act funds were not included in the IHBG/AIAN data and that it had separately gathered individualized population data for those Tribes. Treasury also announced that the IHBG/AIAN data included Tribes that received HUD funds but were otherwise not eligible to receive CARES Act funds. Specifically, in its May 5, 2020, announcement regarding its population-based distributions, Treasury stated:

> For Indian Tribes not included in the IHBG date, HUD provided population figures at Treasury's request. Treasury will not include state-recognized Tribes that participate in the IHBG program but that are not Indian Tribes as defined by Title V of the CARES Act.

*See* Exhibit 2, p. 3 (also included as Exhibit 4 to the Tribe's Expedited Motion).

Thus, contrary to its portrayal of its decision-making process, Treasury did not merely decide which population dataset was the most reliable and then immediately make funding decisions based solely on its chosen dataset. Rather, Treasury picked a dataset, scrutinized it for some errors, and then took steps to correct those errors. Yet when faced with an undisputed zero-population error for the Miccosukee Tribe, however, Treasury did nothing. The zero-population error is essentially the equivalent of not being included in the IHBG/AIAN data at all. Treasury had an obligation to address this error and resolve internal inconsistencies through a rational process that resolved conflicting evidence regarding the Miccosukee Tribe's population, just as it

did for Indian Tribes not listed in the IHBG/AIAN data, and just as it did for non-federally recognized Indian Tribes listed in the data.  There is no dispute that Treasury failed to do so.

In sum, Treasury's response addresses an agency decision—the choice of one dataset over another—that the Tribe has not challenged.  Whatever the merits of Treasury's arguments may be with respect to that decision, they are irrelevant here.  Accordingly, the Court should hold that the Tribe is likely to succeed on the merits of its claim.[2]

> **B. Treasury's argument that CARES Act distribution decisions are not subject to judicial review ignores the CARES Act's statutory mandate and was recently rejected, in part, by the D.C. Circuit Court of Appeals.**

There is "a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (citation omitted).  A narrow exception to that rule applies only in the rare circumstances in which judicial review is simply not feasible because there is no statutory standard against which the Court can evaluate the agency's action.  As the Tribe's opening brief explained, there is such a standard here:  the requirement that the funding determination for each Tribal government must be "based on increased expenditures of each such Tribal government . . . relative to aggregate expenditures in fiscal year 2019 by the Tribal government . . . ." 42 U.S.C. § 801(c)(7).  Pl. Br. at 15–17.

---

[2] There is a substantial question whether Treasury even has adequately defended its decision to choose one dataset over another.  Attempting to explain why its choice of the IHBG/AIAN dataset was rational, Treasury relies almost entirely upon arguments of counsel and a Declaration by an agency official (Daniel Kowalski) drafted for purposes of this litigation. Defs' Br. at 15-16.  Yet the arbitrariness and capriciousness of an agency decision turns on the rationale stated contemporaneously in the decisional document itself, not in later litigation submissions.  It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015).  In determining whether an agency decision is arbitrary and capricious under the APA, courts must base their judicial review on the "reasons stated in the [decision] under review." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).  The courts must not "consider the agency's post-hoc rationalizations." *Id*. (citing *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 164 (D.C. Cir. 2010)).

Treasury does not even respond to the Tribe's argument that the CARES Act's "increased expenditures" provision empowers the Court to review Treasury's zero-population funding decision. Accordingly, Treasury also does not address the critical point that because it chose to use population as the measure for increased expenditures, an irrational decision regarding population *also constitutes an irrational decision regarding increased expenditures*. This point wholly undermines Treasury's assertion that it has complete and unfettered discretion to determine population and that the Court is powerless to step in—even where Treasury relies on population data it knows is false. The logical extension of Treasury's argument is that Treasury can determine relative expenditures through a wholly irrational process without being reversed by a court. That obviously cannot be the case, given Congress's express directive that the distributions to Tribes "shall be . . . based on" increased relative expenditures. 42 U.S.C. § 801(c)(7).

As the Tribe has acknowledged, the CARES Act provides discretion to Treasury to determine that population can be used to determine increased expenditures. But that certainly does not mean that Treasury's irrational decision regarding the Miccosukee Tribe's population is completely beyond the scope of judicial review. *See, e.g.*, *Sierra Club v. EPA*, 356 F.3d 296, 307 (D.C. Cir. 2004) (conducting judicial review of agency decision under statutory requirement that decision must be "based on" defined analytical method); *see also Citizens for Responsibility and Ethics in Washington v. FEC*, 892 F.3d 434, 440-41 (D.C. Cir. 2018) (addressing discretionary agency decisions that are subject to judicial review for "abuse of discretion" under 5 U.S.C. § 706(2)(A)).

Instead of addressing the foregoing analysis on its merits, Treasury simply repeats the bottom-line conclusions of two decisions of the U.S. District Court for the District of Columbia— *Shawnee Tribe v. Mnuchin*, 2020 WL 5440552, and *Prairie Band Potawatomi Nation v. Mnuchin*,

2020 WL 3402298. (Def. Brief, at 11–12). The Tribe addressed the *Shawnee Tribe* decision in its Expedited Motion. (Expedited Motion at 15–17). In sum, the Tribe contends that both the *Shawnee Tribe* decision and the *Prairie Band* decision were decided incorrectly because they both rely on an incorrect application of the U.S. Supreme Court's decision in *Lincoln v. Virgil*, 508 U.S. 182 (1993). *Lincoln* stands for the proposition that courts cannot review certain agency funding decisions from so-called "lump-sum" appropriations which provide no guidance or restrictions on spending. The appropriation at issue in *Lincoln* provided no guidance to the administering agency, Indian Health Services ("IHS"), other than the requirement that the funds be used "for the benefit, care, and assistance of the Indians," for the "relief of distress and conservation of health," and, "therapeutic and residential treatment centers" for Indian mental-health care. *See id.* at 185. The plaintiffs in *Lincoln* did not assert that IHS failed to meet these broad statutory goals. Rather, they challenged IHS's decision to end a specific health services program and reassign funds and personnel to a different health services program designed to address the same needs. *Id*. at 187-88. Congress had never specifically authorized either program and had never specifically appropriated funds to either program. *Id.* In that context, the U.S. Supreme Court held that it had no ability to review IHS's decision because Congress provided no restrictions on IHS's specific spending decisions so long as those decisions met the broad goals of the applicable statutes. *See id*. at 194–95.

     *Lincoln* has no application to this dispute. In contrast to the statutes at issue in *Lincoln*, the CARES Act did not provide Treasury with broad discretion to distribute funds based solely on general criteria such as "the benefit, care, and assistance of the Indians." Rather, the CARES Act specifically states that the "amount paid . . . to a Tribal government" must be "based on increased expenditures" of "each such Tribal government" relative to 2019 expenditures by "the Tribal

8

government."  These specific criteria distinguish this dispute from *Lincoln* and provide the necessary measuring stick against which this Court can review Treasury's actions.[3]

Finally, Treasury asserts that three structural or contextual considerations in the statute preclude judicial review: the short deadline for disbursing funds, the urgency of providing funds quickly, and the lack of any requirement for advance notice of funding decisions. Defs' Br. at 12–14.  On Friday, September 25, 2020, in a different case addressing the distribution of CARES Act funds to Tribal governments, the U.S. Court of Appeals for the D.C. Circuit decisively rejected Treasury's argument, ruling that "[w]e are unpersuaded." *See Confederated Tribes of the Chehalis Reservation, et al., v. Mnuchin*, Case # 20-5204 (D.C. Cir.), slip opinion, p. 10 (Sept. 25, 2020) (copy included as Exhibit 1).  The D.C. Circuit properly held that Treasury had not proved that short statutory deadlines preclude judicial review by implication, that the agency's "urgency" argument was simply a variation on the same theme, and that advance notice occurred.  This Court should reach the same conclusions and hold that the Tribe is likely to prove that Treasury's "zero-population" decision is judicially reviewable.

### C. Defendants fail to allege any harm suffered by the timing of the Tribe's Complaint and its Expedited Motion for Preliminary Injunction

Treasury devotes significant time to what it perceives as the Miccosukee Tribe's delays in filing its Complaint and its Expedited Motion.  But at no point in its response does Treasury allege

---

[3] Furthermore, *Prairie Band* did not involve a zero-population determination.  Rather, the "gravamen of Plaintiff's complaint" was Treasury's use of "a different methodology than proposed during consultation with the Tribes and one not based on tribal enrollment."  *See Prairie Band*, * 2020 U.S. Dist. LEXIS 108155, at *5–6.  And although *Shawnee* did involve a zero-population determination, the D.C. District Court construed the plaintiff's challenge primarily as a challenge to Treasury's decision to use population as a proxy for increased expenditures.  *See Shawnee*, 2020 U.S. Dist. LEXIS 149434, at *3–5.  In neither case did the D.C. Circuit Court address the specific claim raised by the Miccosukee Tribe—that Treasury's specific decision to distribute funds to the Tribe based on an obviously false zero-population determination was arbitrary and capricious.

9

any harm caused by the alleged delay. And it does not assert that the Tribe missed any specific deadlines in requesting its relief. Furthermore, the Miccosukee Tribe responsibly sought to resolve this dispute through discussions and negotiations with Treasury, and other administration officials, as well as Congressional representatives. Only after those efforts failed did the Tribe resort to litigation. The Tribe cannot be faulted for its responsible approach to seeking a resolution of this dispute.

Lastly, the timing of the Tribe's Expedited Motion was dictated by the speed at which the D.C. Circuit Court of Appeals was considering the expedited appeal in *Confederated Tribes of the Chehalis Reservation, et al., v. Mnuchin*, Case # 20-5204 (D.C. Cir.). As described in the Tribe's Expedited Motion, on July 7, 2020, in the *Confederated Tribes* matter the D.C. District Court enjoined Treasury from distributing the remaining CARES Act funds pending the resolution of the appeal to the D.C. Circuit Court. *See Confederated Tribes of the Chehalis Reservation, et. at., v. Mnuchin*, Case # 20-cv-01002 (APM), Dkt. # 107) (D.C. Dist.). Thus, when the Tribe filed its Complaint on July 31, 2020, Treasury was already enjoined from distributing the remaining CARES Act funds. Thus, there was no need, at that time, for the Tribe to seek a temporary restraining order or preliminary injunction. Only after the D.C. District Court scheduled oral arguments in the expedited appeal of the Confederated Tribes matter did the Tribe believe it was appropriate to seek a preliminary injunction from this Court. Oral arguments in the Confederated Tribes appeal were held on September 11, 2020. The Tribe filed its Expedited motion one week later, on September 18, 2020. Just as the Tribe acted responsibly in seeking to resolve this dispute without litigation, the Tribe also acted responsibly by refrain from seeking injunctive relief until an exigency arose: the impending decision in the *Confederated Tribes* appeal.

Respectfully submitted, this 28th day of September, 2020.

/s/ George B. Abney
George B. Abney
Daniel F. Diffley (admitted *pro hac vice*)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000 (telephone)
(404) 881-4777 (facsimile)
E-mail:  George.Abney@alston.com

Daniel G. Jarcho (admitted *pro hac vice*)
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC 20004-1404
(202) 239-3300 (telephone)
(202) 239-3333 (facsimile)
E-mail:  Daniel.Jarcho@alston.com